**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KIM EILEEN BERNARD,** | : | **Civil No. 3:22-CV-01889** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

At the heart of this case lies a common theme, where an ALJ's finding that a claimant is not entirely disabled is at odds with a claimant's reports of debilitating, disabling pain. The plaintiff, Kim Eileen Bernard, suffers from chronic back pain and has been diagnosed with lumbar degenerative disc disease. She testified that she has had multiple back surgeries and treatments since she began having pain around 2004, with her last surgery being in 2015. (Tr. 61). She worked as a paralegal from 1995 until March 18th, 2020, when she was laid off due to the pandemic. (Id.) Bernard testified that, although she stopped working due to the pandemic, her pain had been affecting her ability to fulfill her work duties and she had been attempting to move to a more part-time schedule. (Id.) Although Bernard conceded that her

1

position was mostly sedentary and did not require much lifting or heavy activity, her difficulties stemmed from her alleged inability to sit for extended periods, and her need for multiple breaks and absences due to pain and fatigue caused by her medications. (Tr. 59, 60, 62-63). She was treating her pain conservatively, primarily with prescription medications. (Tr. 59, 83, 269). She alleges he became disabled on March 18th, 2020, due to back problems, anxiety, depression, chronic fatigue syndrome, spine problems, inflammation, insomnia, and spinal stenosis.[1] (Tr. 221).

As to the medical evidence, the treatment records are relatively sparse, especially after the alleged disability onset date when Bernard had just one telehealth visit with her primary care doctor and a consultative examination. And, although the medical records consistently note persistent lower back pain, with numbness and weakness, the examination notes from her primary care doctor spanning from 2015 through May 2020 are relatively unremarkable and show that she was managing her pain with prescription medication. (Tr. 411-450).

---

[1] The ALJ found that Bernard's medically determinable mental impairments of depressive disorder, generalized anxiety disorder, and panic disorder did not cause more than a minimal limitation in Bernard's ability to perform basic mental work activities and were therefore non-severe. (Tr. 36). The plaintiff does not challenge this determination, so we do not address the ALJ's determination of her mental impairments, beyond noting that the record supports this determination based upon the plaintiff's testimony and the clinical examinations and assessments showing no limitations based on these impairments. (Tr. 61-62, 79-80, 97-98, 517-520).

On these facts, the ALJ who presided over Bernard's disability hearing concluded that she had not met the stringent standard required to establish disability and denied this claim. (Tr. 30-44). While Bernard challenges the ALJ's decision, we are reminded of the familiar proposition that we exercise a limited scope of substantive review when considering Social Security appeals. As the Supreme Court has noted:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In this case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that

3

substantial evidence supported the ALJ's findings that the plaintiff was not disabled. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

The administrative record of Bernard's disability application reveals the following essential facts: Bernard applied for disability insurance benefits on May 14, 2020, alleging an onset of disability beginning on March 18, 2020. (Tr. 33). Bernard was born on August 15, 1962, and was approximately 57 years old at the time of the alleged onset of her disability. (Tr. 69). She completed high school and attended some college and was previously employed as a paralegal. (Tr. 70). Bernard's relevant medical impairments consisted of chronic lower back pain due to spinal disorder, including lumbar degenerative disc disease and piriformis syndrome. (Tr. 36). She testified that she is unable to work full-time due to pain and discomfort in her back and due to fatigue caused by her medications. (Tr. 57, 59).

Bernard's record includes treatment notes dating back to as early as 2004, when she alleges her lower back pain started.[2] Early records from Somers

---

[2] The Commissioner points out that Bernard previously applied for disability benefits in August 2016, but that application was denied following a hearing on June 6, 2018, and not appealed. (Doc. 15, at 3; Tr. 74, 88). The defendant argues that, given the prior ALJ decision on June 6, 2018, consideration of the treatment record from that period is barred by *res judicata*. Since we ultimately affirm the decision of

4

Orthopedic Surgery and Sports Medicine Group indicate that she had been treating her pain with prescription medication since 2004, (Tr. 389), had a laminectomy in March 2005, (Tr. 409), and received several epidural injections in 2005 and 2006. (Tr. 340, 395-96). Then around 2015 she began treatment with her primary care physician at Northern Medical Group, principally seeing Dr. Marcie Wolinsky Friedland. (Tr. 411-450). Her treatment records between 2015 and 2018 show relatively routine visits to follow-up on chronic pain and renew medications. (Tr. 419-450). Examinations during this time typically reported no acute distress, normal strength, and gait, very flexible SLR, but noted persistent back and leg pain, and occasional numbness. (Id.) A 2017 MRI revealed mild levocurvature of the lumbar spine and mild reverse s-shaped scoliotic curvature of the thoracic and lumbar spine, and multilevel thoracic disc desiccation. (Tr. 467-470). She continued treating with prescription pain medications, but declined an additional surgery in April 2018, (Tr. 428), and reported that she did not desire to pursue a spinal cord stimulator that was recommended in July 2018. (Tr. 421). An October 2018 examination note indicated stable back pain with no further pain management procedures. (Tr. 419).

---

the Commissioner, finding substantial evidence supported the ALJ's decision even considering the pre-2018 records, we need not decide this question. We summarize these pre-2018 records to provide context and a more robust view of Bernard's ongoing medical issues, given the paucity of medical evidence available.

Around the alleged onset date, Bernard continued routine follow-up visits with Dr. Wolinsky Friedland. In February 2019, Bernard noted chronic lower back pain, and an examination found some tenderness in inguinal ligament on right and iliopsoas on the right, but otherwise unremarkable findings. (Tr. 417-18). It was noted she was not a candidate for additional surgery. (Id.) A July 2019 appointment revealed increasing back and leg pain since a fall several months prior, and still tenderness, but other examination results remained the same. (Tr. 415-16). In December 2019, Bernard reported increased pain in her lower lumbar area radiating to her buttock and numbness in her toes and pressure sensation on her left leg. (Tr. 413-14). She asked for a trigger point injection and was prescribed methylprednisone. (Id.) The only appointment after her alleged onset date, on May 20, 2020, was a telehealth visit that noted increased back pain and leg pain since the fall several months prior. (Tr. 411). Dr. Wolinsky Friedland refilled her prescription for methylprednisone. (Id.)

Consultative examiner, Dr. Paul Mercurio, also completed an examination of Bernard on August 28th, 2020. (Tr. 510-514). Dr. Mercurio noted that Bernard appeared to be in no acute distress, had a normal gait, used no assistive devices, and changed and got on and off the exam table without help. (Tr. 512). She was also able to rise from a chair without difficulty. (Id.) His examination showed Bernard's

6

lumbar spine flexion limited to seventy degrees with full extension, full lateral flexion bilaterally, and full rotary movement bilaterally. (Id.) He also noted full range of motion in her upper extremities, hips, knees, and ankles. (Id.) He noted no scoliosis, kyphosis, or abnormality in thoracic spine. (Id.) He noted 5/5 strength in her upper and lower extremities, and no sensory deficits. (Id.) A lumbar spine x-ray showed post-surgical changes, mild increased levocurvature of the lumbar spine, and calcified plaques in the abdominal aorta, but preserved disc spaces, and no significant or acute osseous abnormality. (Tr. 515).

Based upon this sparse clinical history, especially during the time of the alleged onset date of March 18, 2020, four medical sources opined regarding the disabling effect of Bernard's degenerative disc disease.

State agency medical consultant S. Siddiqui, M.D., completed a Physical Residual Functional Capacity Assessment on September 23, 2020. Based on his assessment of Bernard's record, Dr. Siddiqui opined that Bernard could lift and/or carry up to 20 pounds occasionally, up to 10 pounds frequently, and could push and/or pull as much as she could lift and/or carry. (Tr. 82) He opined she could sit, stand, and/or walk about six hours each in an eight-hour workday and that she could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, or crawl. (Id.) Upon reconsideration, state agency medical consultant

Catherine S. Smith, M.D. completed a Physical Residual Functional Capacity Assessment on January 15, 2021, and opined the same limitations as those set forth by Dr. Siddiqui at the initial level. (Tr. 100-103).

Bernard's treating physician, Dr. Wolinsky Friedland completed a physical assessment of Bernard on June 11th, 2020. (Tr. 504). She noted Bernard's diagnosis as Chronic Lumbar Degenerative Disc Disease and noted that her symptoms would often be severe enough to interfere with the attention and concentration required to perform simple work-related tasks. (Id.) Specifically, she reported "drowsiness" as a side effect of her medications and indicated that she would need to recline or lie down during an eight-hour workday in excess of the typical breaks. (Id.) Dr. Wolinsky Friedland opined that Bernard could sit for a total of two hours and stand/walk for a total of one hour in an eight-hour workday. (Id.) Further, Dr. Wolinsky Friedland noted that Bernard would need to take fifteen-minute unscheduled breaks hourly, could occasionally lift less than ten pounds, but never ten pounds or more, but had no limitations in her upper extremities, except only being able to reach ninety percent of the time. (Id.) Finally, Dr. Wolinsky Friedland opined that Bernard would likely be absent from work more than four times a month as a result of her impairments. (Tr. 505).

Consultative examiner, Dr. Paul Mercurio, also completed a Medical Source Statement on August 28, 2020, following his examination of Bernard. Dr. Mercurio opined that Bernard would have mild limitation for prolonged standing or walking, and climbing stairs, moderate limitation for repetitive bending, lifting, carrying, or kneeling, and no limitation for reaching, handling objects, hearing, seeing, speaking, or sitting. (Tr. 513). He noted her prognosis was "fair." (Id.)

A telephonic disability hearing was conducted on June 30, 2022, at which Bernard and a vocational expert testified. (Tr. 49-72). At the hearing, Bernard testified about her symptoms, stating that she suffers from chronic pain 24/7 because of her failed back surgeries. (Tr. 57). She noted that she can lift no more than five pounds but can walk unassisted in small amounts. (Tr. 58). She stated that, before taking her medication each morning she is in unbearable pain, and the pain returns two hours after taking her medication. (Tr. 60). She testified that she drives a couple of times per week, traveling within ten miles of her home, and can sit no more than one hour before having to walk around. (Tr. 63). According to Bernard, she has been taking pain medication for seventeen years, which mostly work for her pain but cause fatigue. (Tr. 59). She stated that she had been working less than full-time prior to being laid off during the pandemic because she was falling asleep at her desk while working. (Id.)

A vocational expert, Dana Marlowe, also testified at the hearing. According to the vocational expert, an individual with Bernard's same age, education, and past work experience who was limited to a light range of work requiring no more than occasional postural maneuvers such as balancing, stooping, kneeling, crawling, crouching, and climbing would be able to perform Bernard's past relevant work. (Tr. 70). However, such an individual limited to no more than a sedentary range of work and requiring breaks, absences, and time off task at will, that could exceed fifteen percent or more of a given work week or month, would not be able to perform Bernard's past relevant work. (Tr. 70-71). The VE further testified that including a limitation on standing and walking less than two hours per day would impact the ability to do Bernard's previous work and there would not be any other light work she could do with such limitations. (Tr. 71).

Following the hearing, the ALJ issued a decision denying Bernard's application for benefits. (Tr. 30-44). In that decision, the ALJ first concluded that Bernard met the insured requirements of the Act through December 31, 2025, and had not engaged in substantial gainful activity since March 18, 2020. (Tr. 35). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Bernard had the following severe impairments: spinal disorder including lumbar degenerative disc disease and piriformis syndrome. (Tr. 36). The ALJ also noted that

10

Bernard has a history of hypertension and has been diagnosed with depressive disorder, a history of generalized anxiety disorder, and a history of panic disorder, but that these ailments were considered "non-severe" because the record did not demonstrate that these conditions cause any significant functional limitations or that they have lasted or are expected to last 12 months or more.[3] (Id.)

At Step 3, the ALJ determined that none of these conditions met any of the Commissioner's listing criteria. The ALJ considered listings 1.15 (Disorders of the Skeletal Spine Resulting in Compromise of a Nerve Root) and 1.16 (Lumbar Spinal Stenosis Resulting in Compromise of the Cauda Equina). (Tr. 39). The ALJ supported this determination by noting that the evidence did not show the abnormalities on diagnostic testing and/or the longitudinal deficits on physical examination to the level required by listing 1.15 or 1.16. (Id.) Specifically, the ALJ noted that listings 1.15 and 1.16 both require:

> [M]edical documentation of at least one of the following: a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; or an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility

---

[3] In making this determination, the ALJ analyzed the "paragraph B" criteria which set out the broad functional areas of mental functioning for evaluating mental disorders. (Tr. 36). Because this determination is not at issue in the plaintiff's appeal, we do not discuss this analysis.

> device involving the use of one hand; or an inability to use both upper
> extremities to the extent that neither can be used to independently
> initiate, sustain, and complete work-related activities involving fine and
> gross movements.

(Id.) The ALJ noted that the medical evidence did not support the need for an assisted

device and examinations showed some reduced range of motion and tenderness but

no other significant deficits. (Id.)

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity

("RFC") for the plaintiff which considered Bernard's impairments as reflected in the

medical record, and found that:

> After careful consideration of the entire record, the undersigned finds
> that the claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) except she is limited to
> occupations which require no more than occasional postural
> maneuvers, such as balancing, stooping, kneeling, crawling, crouching,
> and climbing.

(Tr. 40).

Specifically, in making the RFC determination, the ALJ considered the

medical evidence and Bernard's testimony regarding her impairments. The ALJ first

engaged in a two-step process to evaluate Bernard's alleged symptoms. He found

that, although the claimant's medically determinable impairments could reasonably

be expected to cause some of the alleged symptoms, the claimant's statements

concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.

The ALJ considered Bernard's primary care treatment records from before her alleged onset date, including her appointment on July 10, 2019, and a follow-up visit on December 18, 2019. The ALJ noted that she reported increased lower back pain at each appointment, including pain and tenderness in her lower left lumbar area radiating into her buttocks with numbness and pressure sensation of the entire left leg, but physical examinations at each appointment revealed that she appeared in no acute distress, had normal motor strength in upper and lower extremities, intact sensory examination, no tenderness of the back, a very flexible straight leg raise, and negative for paravertebral spasms of the neck. (Tr. 41). The ALJ further noted that at her July 2019 appointment she was diagnosed with degeneration of the lumbar or lumbosacral intervertebral disc and Piriformis syndrome of the left side and was prescribed medication and at her December 2019 appointment she was given an injection. (Id.)

Since her alleged onset date, the ALJ highlighted that Bernard had only had one visit for treatment with Dr. Wolinsky Friedland on May 20, 2020, when she reported ongoing back and leg pain, was diagnosed with degeneration of the lumbar or lumbosacral intervertebral disc, and it was recommended she continue with her

medication. (Id.) The ALJ also considered Bernard's physical examination with consultative examiner Paul Mercurio on August 28, 2020, where an examination revealed that Bernard had a normal gait, half squat, normal stance, was able to walk on heels and toes without difficulty, was able to rise from a chair without difficulty, and used no assistive devices. (Id.) Although the ALJ noted that she had limited range of motion in her lumbar spine during this examination, she had a negative straight leg raise bilaterally, no sensory deficits, 5/5 strength in the upper and lower extremities, and 5/5 grip strength bilaterally with hand and finger dexterity intact. (Id.) Further, an x-ray of the claimant's lumbar spine from that date revealed post-surgical changes, but no significant acute or osseous abnormalities. (Id.)

With regard to the clinical treatment records, the ALJ explained:

Overall, the longitudinal evidence of record does not support the claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms. Physically, the claimant had very little treatment since her alleged onset date of disability, consisting of only one treatment visit with her primary care provider, at which time she was diagnosed with degeneration of the lumbar or lumbosacral intervertebral disc (Exhibit B2F, p. 1). Prior recent examinations showed some tenderness, but otherwise were entirely within normal limits (Exhibit B2F, pp. 3-8). A physical consultative examination showed the claimant had limited range of motion in her spine and a 1/2 squat, but otherwise the examination was entirely within normal limits. An x-ray of the claimant's spine showed no abnormalities other than post-surgical changes (Exhibit B5F). The undersigned has considered the claimant's degenerative disc disease and Piriformis syndrome when providing for the limitations in the residual functional capacity above,

however, the medical evidence of record supports no greater
limitations.

(Tr. 41).

In fashioning the RFC, the ALJ also considered the statements and activities
of Bernard, referencing both her hearing testimony and Function Report, (Tr. 259-
274). The ALJ emphasized that Bernard reported performing daily activities like
helping her parents with shopping, caring for pets, caring for personal needs,
preparing meals daily, performing limited household chores, driving, shopping in
stores and by computer, handling finances, reading, sewing, doing crafts, and
socializing. (Tr. 42). And, while the ALJ acknowledged some limitation in Bernard's
ability to perform those activities, considered with the medical evidence, the ALJ
found her statements about her activities of daily living suggested that she could
perform work within the designated RFC. (Id.)

Finally, in fashioning the RFC, the ALJ considered the medical opinions and
prior administrative medical findings. The ALJ found the assessments of state
agency medical consultants Dr. Siddiqui and Dr. Smith persuasive, explaining that
they are consistent with and supported by the medical evidence of record, including
treatment records of Bernard's primary care provider and the consultative
examination of Dr. Mercurio showing no significant deficits. (Tr. 42).

The ALJ found the Medical Source Statement of consultative examiner Dr. Mercurio somewhat persuasive, however noting that no greater limitations than those provided for in the RFC were supported by the medical evidence, including Dr. Mercurio's own examination of Bernard showing no significant deficits. (Id.)

As to the medical opinion of treating physician Dr. Wolinsky Friedland, the ALJ found this opinion unpersuasive because its checkbox format lacked substantive explanation for the extreme limitations prescribed therein and because the opinion was inconsistent with the objective evidence of record, including her primary care treatment records, the consultative examination of Dr. Mercurio showing no significant deficits, and the opinions of Dr. Siddiqui and Dr. Smith. (Id.)

Having arrived at this RFC assessment, the ALJ found that Bernard could perform her past relevant work as a paralegal and a composite position consisting of a paralegal and an office manager, as this work does not require the performance of work-related activities precluded by her RFC. (Tr. 43). Based upon these findings, the ALJ determined that Bernard did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 44).

This appeal followed. (Doc. 1). On appeal, Bernard argues that the ALJ's RFC determination was not supported by substantial evidence because he failed to properly evaluate the opinion of treating physician Dr. Wolinsky Friedland. This

case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

<u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see,
> e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v.
> Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that he is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

19

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d
Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at
*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar
v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun
v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,
2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366
(M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating
the existence of a medically determinable impairment that prevents him or her in
engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this
burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show
that jobs exist in significant number in the national economy that the claimant could
perform that are consistent with the claimant's age, education, work experience and
RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive
requisites. Most significant among these legal benchmarks is a requirement that the
ALJ adequately explain the legal and factual basis for this disability determination.
Thus, in order to facilitate review of the decision under the substantial evidence
standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

## C. <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence</u>

The plaintiff filed this disability application in May of 2020 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.

According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### E.   <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial

28

evidence supported the decision by the ALJ that Bernard retained the residual functional capacity to perform light work with certain limitations. Therefore, we will affirm this decision.

In reaching this conclusion, we note that the ALJ's decision comported with the opinion of the medical experts whose judgment the ALJ determined had the greatest persuasive power, Dr. Siddiqui and Dr. Smith. Substantial evidence supported this assessment of the medical opinion evidence as the state agency medical consultants' opinions were supported and explained in terms of diagnostic test results and objective clinical findings. Further, the opinions of Dr. Siddiqui and Dr. Smith are consistent with Bernard's unremarkable, and sparse, primary care treatment records, and the examination of Dr. Mercurio, which revealed that Bernard had a normal gait, half squat, normal stance, was able to walk on heels and toes without difficulty, was able to rise from a chair without difficulty, used no assistive devices, and despite limited range of motion in her lumbar spine, showed a negative straight leg raise bilaterally, no sensory deficits, 5/5 strength in the upper and lower extremities, and 5/5 grip strength bilaterally with hand and finger dexterity intact. These opinions are also consistent with the August 2020 x-ray of the claimant's lumbar spine showing no significant acute or osseous abnormalities.

The plaintiff's sole argument is that the ALJ failed to properly evaluate the opinion of Bernard's treating physician, Dr. Wolinsky Friedland. As previously noted, Bernard's disability claim was filed after a paradigm shift in the requirements for an ALJ's assessment of medical opinion testimony. Thus, while prior to 2017 treating sources were generally entitled to more weight when considering competing medical opinions, the new regulations adopted a more holistic approach to the analysis, requiring the ALJ to evaluate all medical opinions based on their persuasiveness and explain how he or she considered the supportability and consistency of the medical opinion. Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

The plaintiff argues the ALJ's evaluation of the supportability and consistency of Dr. Wolinsky Friedland's opinion was deficient. She first contends that the ALJ erred in finding Dr. Wolinsky Friedland's opinion unpersuasive due to its checkbox format, arguing that, while the opinion itself contained no explanation for the extreme limitations, it was supported by the extensive treatment records of Dr. Wolinsky Friedland as Bernard's treating primary care physician. She also alleges that the ALJ cherry-picked evidence in finding Dr. Wolinsky Friedman's opinion to be inconsistent with other opinion evidence.

However, in our view, the ALJ's decision to afford little persuasive force to the opinion expressed by Dr. Wolinsky Friedland was fully supported by substantial evidence in the administrative record, and the grounds for that decision were fully, and cogently, explained by the ALJ in her decision.

At the outset, we note that Dr. Wolinsky Friedland's treating source opinion was made in a singularly unpersuasive fashion through cursory notations on a check box form. On this score, it is well settled that: "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

Further, even Dr. Wolinsky Friedland's contemporaneous treatment records offer little support for the extreme limitations recommended in her assessment. First, the record contains notes from only three visits in the year leading up to the alleged onset date of Bernard's disability and only one telehealth visit following the onset date. The ALJ acknowledged these records, explaining that Bernard's treatment since her alleged onset of disability consisted of "only one treatment visit with her primary care provider, at which time she was diagnosed with degeneration of the lumbar or lumbosacral intervertebral disc. Prior recent examinations showed some tenderness, but otherwise were entirely within normal limits." (Tr. 41). And, more to the point, even Dr. Wolinsky Friedman's treatment records are rather formulaic,

31

consistently report the same examination results, and contain few clinical observations that would support the limitations in her assessment. These records tend to indicate that, while Bernard reported chronic pain in her lower back, her condition had not changed significantly over the years preceding her alleged onset date and her symptoms were being managed with medication. On this score, it is well established that an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Thus, there was no error here.

As to the plaintiff's argument that the ALJ cherry-picked information in the record to demonstrate that Dr. Wolinsky Friedman's opinion was inconsistent with the objective evidence of record, even considering the scant clinical record, we find the ALJ thoroughly evaluated and accurately represented the evidence in this case. The ALJ stated that Dr. Wolinsky Friedland's opinion was inconsistent with Bernard's primary care treatment records, which primarily consisted of Dr. Wolinsky Friedland's own records, as well as the consultative examination of Dr. Mercurio and the medical opinions of Dr. Siddiqui and Dr. Smith. While imaging of the plaintiff's spine and the longitudinal record undisputedly indicates chronic degenerative disc disease and mild curvatures in the plaintiff's lumbar spine, (Tr.

32

413, 430, 469, 515), examination notes also consistently demonstrate that Bernard had normal strength in her upper and lower extremities, intact sensory exam, flexible SLR, and a normal gait. (Tr. 411-450). These examination results also bolster and provide substantial support for the ALJ's analysis here since an ALJ may discount a treating source opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Further, Dr. Mercurio, who most recently examined Ms. Bernard, acknowledged that she had a limited range of motion in her lumbar spine, but still found that she had only mild limitations for prolonged standing or walking based on his observation of a normal gait, ability to walk on her heels and toes without difficulty, ability to rise from a chair without difficulty, and the fact that Bernard used no assistive devices.

The ALJ also explained that Dr. Wolinsky Friedman's opinion was unpersuasive since it was inconsistent with Dr. Siddiqui and Dr. Smith's opinions recommending much more conservative limitations based on the entirety of her clinical record. In fact, Dr. Wolinsky Friedman's opinion is also inconsistent with plaintiff's own statements indicating that, although it was uncomfortable for her to sit for more than an hour without moving, at her previous job she was able to take time to get up, walk around, get a cup of coffee, and take her medication, and then

return to work.[4] (Tr. 63). While Bernard argues on appeal that the ALJ erred in this assessment, at bottom this argument invites us to re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). This we cannot do. Instead, the scope of our review is limited to determining whether substantial evidence; that is, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, supports the ALJ's finding. Guided by this deferential standard of review, we conclude that sufficient evidence supported the ALJ's decision that Bernard did not meet the stringent standard of disability set by the law.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus,

---

[4] It is also worth noting that Bernard testified that she stopped working on March 18th of 2020 due to the pandemic and, at the time of the alleged onset of Bernard's disability, she was collecting unemployment. (Tr. 58, 234). She testified that she made the requisite certification that she was "ready willing, and able to work" during that period, including at the time of her last appointment with Dr. Wolinsky Friedman. (Id.)

notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: December 20, 2023